IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GONUL KAZMI,                          )
                                      )
        Plaintiff,                    )
                                      )     No. 11 C 6123
        v.                            )
                                      )     Magistrate Judge Mary M. Rowland
MICHAEL J. ASTRUE,                    )
Commissioner of Social Security,      )
                                      )
        Defendant.                    )


## MEMORANDUM OPINION AND ORDER

Plaintiff Gonul Kazmi filed this action seeking review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits under Title II of the Social Security Act ("SSA"). 42 U.S.C. §§ 416, 423(d), 1381a. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and the parties have filed cross motions for summary judgment. For the reasons stated below, this case is remanded for further proceedings consistent with this opinion.

## I. THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To recover Disability Insurance Benefits ("DIB") or Supplemental Security Income ("SSI") under Titles II and XVI of the SSA,[1] a claimant must establish that he

---

[1] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 *et seq*. The SSI regulations are virtually identical to the DIB regulations and are set forth at 20 C.F.R. § 416.901 *et seq*.

or she is disabled within the meaning of the SSA. *York v. Massanari*, 155 F. Supp. 2d 973, 977 (N.D. Ill. 2001); *Keener v. Astrue*, No. 06 C 0928, 2008 WL 687132, at *1 (S.D. Ill. 2008). A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520, 416.909, 416.920; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB on September 16, 2007, alleging that she became disabled on January 31, 2006, due to back disorders. (R. at 54, 134, 192, 196.) The application was denied initially and on reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id.* at 54, 133, 134, 142, 151, 156.)

On July 1, 2009, Plaintiff, represented by counsel, testified at a hearing before an Administrative Law Judge ("ALJ"). (R. at 54, 61–130.) The ALJ also heard testimony from Dubir Kazmi, Plaintiff's husband; James M. McKenna, M.D., a medical expert ("ME"); and James Breen, a vocational expert ("VE"). (*Id.*)

The ALJ denied Plaintiff's request for benefits on August 17, 2009. (R. at 54–60.) Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff has not engaged in substantial gainful activity during the period from January 31, 2006, her alleged onset date, through September 30, 2008, her date last insured. (*Id.* at 56.) At step two, the ALJ found that Plaintiff's degenerative disc disease cervical spine and status post-laminectomy lumbar spine[2] are severe impairments. (*Id.*) At step three, the ALJ determined that Plaintiff's impairments did not meet or medically equal the severity of any of the listings enumerated in the regulations. (*Id.*)

---

[2] Post-laminectomy syndrome, also known as failed back syndrome "refers to the persistence of pain and disability following laminectomy. Laminectomy is a type of back surgery performed to relieve nerve compression (radiculopathy) or nerve root injury in the spine caused by disc herniation or spinal canal narrowing (spinal stenosis) related to degenerative changes." <http://www.mdguidelines.com/post-laminectomy-syndrome>

The ALJ then assessed Plaintiff's residual functional capacity ("RFC")[3] and determined that Plaintiff has the RFC to perform light work with limitations. (R. at 56.) Specifically, the ALJ found that Plaintiff

> can lift a maximum of 20 pounds occasionally and lift and carry up to 10 pounds frequently, stand and/or walk about 6 hours in a normal 8-hour workday, sit about 6 hours in a normal 8-hour workday, and push and/or pull to include operation of hand and/or foot controls as restricted by the limitations on carrying /lifting subject to postural limitations of only occasionally climbing ladders, ropes, and scaffolds, and only occasionally stooping, kneeling, crouching and crawling.

(*Id.*) Based on Plaintiff's RFC and the VE's testimony, the ALJ determined at step four that Plaintiff was capable of performing past relevant work as a mortgage company manager and as a mortgage processor. (*Id.* at 59.) Accordingly, the ALJ concluded that Plaintiff was not suffering from a disability as defined by the SSA. (*Id.* at 59–60.)

The Appeals Council denied Plaintiff's request for review on July 6, 2011. (R. at 1–6.) Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

### III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the SSA. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regula-

---

[3] "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675–76 (7th Cir. 2008).

tions. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). The Court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young,* 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

# IV. DISCUSSION

## A. The Relevant Medical Evidence

Plaintiff first complained of back pain in 1999. (R. at 410.) Physical therapy did not alleviate the pain. (*Id.*) An MRI of the lumbar spine indicated that Plaintiff had a herniated disc. (*Id.*) In December 2000, she had neurosurgery. (*Id.*) Following the surgery, Plaintiff received rehabilitation and physical therapy. (*Id.*) However, the pain continued to get worse. (*Id.*) Subsequently, Plaintiff was informed that the pain is caused by scar tissue and nothing can be done about it. (*Id.* at 410–11.) She was treated with multiple epidural injections and continued her physical therapy treatments, but the pain continued. (*Id.*)

In September 2002, an MRI was performed on Plaintiff's lumbar spine. (R. at 262.) The MRI found that Plaintiff had disc degeneration at L4–4 and L4–5 with mild central bulges at these two levels, a mild bilateral ligamentum flavum hypertrophy and facet arthropathy at L3–4 and L4–5, a diffuse loss of signal of the marrow within lumbar vertebral bodies, and postoperative changes of the lower lumbar spine. (*Id.*)

Plaintiff began treating with Nasreen Hamidani, M.D., in October 2005. (R. at 407.) In February 2007, Plaintiff complained of an earache and lower back pain. (*Id.* at 386.) In August 2007, Dr. Hamidani ordered MRI scans of Plaintiff's cervical and lumbar spine. (*Id.* at 314–16.) The cervical MRI revealed that Plaintiff has a broad based right paracentral disco-osteophytic protrusion at C5–C6 with narrowing of the anteroposterior dimension of the spinal canal. (*Id.* at 314.) The lumbar MRI in-

dicated L4–L5 desiccation of the intervertebral disc with diffuse bulging and the suggestion of a laminectomy defect at this level. (*Id.* at 315.) Desiccation was also seen in the L5–S1 intervertebral disc with mild diffuse bulging, along with a laminectomy defect at this level on the right side. (*Id.*) The MRI also found degenerative changes of the facet joints at the L5–S1 level. (*Id.*)

In September 2007, Dr. Hamidani referred Plaintiff to Elton M. Dixon, M.D., a musculoskeletal specialist. (R. at 317–24.) Plaintiff complained of neck pain for the previous three months with bilateral upper extremity sharp and dull pain rated at 8/10 on the pain scale, along with numbness, tingling, and a pins and needles sensation in the upper extremities. (*Id.* at 317.) Her symptoms caused difficulty in sleeping, and she reported dropping items at times. (*Id.*) Plaintiff also complained of chronic low back pain rated at 8/10, along with numbness and tingling in her lower extremities. (*Id.*) She reported that her symptoms are aggravated by climbing stairs, prolonged walking, bending and lifting. (*Id.*) Dr. Dixon performed musculoskeletal and neurological hands-on exams. (*Id.* at 317–18.) He concluded that Plaintiff has (1) repetitive motion syndrome of the upper extremities, including bilateral mild lateral epicondylitis and left medial epicondylitis, mild, as well as carpal tunnel syndrome and rotator strain and sprain; (2) neck pain with cervical radicular symptoms; and (3) status post lumbar laminectomy pain syndrome with lumbar radicular symptoms and lower back pain. (*Id.* at 318.) Dr. Dixon recommended that Plaintiff have an EMG and nerve conduction study of the upper and lower extremi-

ties to assess and localize cervical and lumbar radiculopathy as well as rule out radiculopathy. (*Id.*)

In September 2007, Plaintiff complained of pain in her left ear. (R. at 377.) In December 2007, Plaintiff complained of an earache, severe headaches and dizziness. (*Id.* at 362, 376.) Dr. Hamidani ordered an MRI of Plaintiff's brain and internal auditory canals. (*Id.* at 362–63.) While the MRI scan was normal, the MRI specialist cautioned that a small intracanalicular mass could not be diagnosed without the benefit of intravenous Gadolinium. (*Id.*)

Shortly thereafter, Dr. Hamidani referred Plaintiff to a neurosurgeon specialist at the Neurological Surgery and Spine Surgery medical group. (R. at 371–74.) Plaintiff complained of neck, lower back and right leg pain. (*Id.* at 371.) She rated her back pain as 7/10 and stated this level of pain was fairly consistent. (*Id.*) She described her neck pain as 6–7/10, which extends along the left side of her neck to the lateral arm and elbow and includes numbness in her fingers. (*Id.*) Her neck pain worsens at night, which makes it difficult to sleep. (*Id.*) Recently, Plaintiff had experienced headaches and dizziness, with buzzing in her left ear. (*Id.*) The neurosurgeon performed a detailed neurological exam. (*Id.* at 372–74.) He reviewed the August 2007 MRI scans and the September 2007 EMG and confirmed those results. In addition, the neurosurgeon diagnosed lumbar degenerative disc disease, cervical spondylosis,[4] and gastroesophageal reflux disease. (*Id.* at 374.)

---

[4] Spondylosis is a degenerative disease of the spine. <http://www.merriam-webster.com/medlineplus/spondylosis>.

In January 2008, Dr. Hamidani completed a Disorders of the Spine Residual Capabilities Questionnaire. (R. at 407–08.) He opined that Plaintiff's cervical spondylosis and lumbar degenerative disc disease have or would last at least 12 months. (*Id.* at 407.) He stated that Plaintiff's symptoms include muscle spasms, chronic pain, impaired sleep, impaired concentration, radiculopathy, numbness and tingling, frequent severe headaches, and severe fatigue. (*Id.*) Plaintiff's pain was located in both the lumbosacral and cervical spine and was precipitated by fatigue, movement/overuse, stress, static position, and cold. (*Id.*) Dr. Hamidani noted that Plaintiff's range of motion in the lumbosacral and cervical spine was severely limited. (*Id.*) Specifically, in the lumbosacral spine, her range of motion was extension 0–10°, flexion 30°, and rotation 20°; in the cervical spine, extension 5–10°, flexion 60°, and rotation 70°. (*Id.*) Dr. Hamidani found Plaintiff's description of pain credible and concluded that work activities would aggravate her pain. (*Id.* at 408.) He found that Plaintiff's pain would affect her ability to concentrate and maintain attention. (*Id.*) Dr. Hamidani opined that Plaintiff could not perform sedentary work or any employment that required prolonged sitting or standing. (*Id.*) He concluded that she would likely miss more than three days of work per month. (*Id.*)

In February 2008, Maresh Shah, M.D., completed an internal medicine consultative examination on behalf of the Commissioner. (R. at 410–13.) Dr. Shah reviewed relevant medical reports and obtained a history of Plaintiff's complaints. (*Id.* at 410–11.) Dr. Shah conducted physical, neurological, and mental status examinations. (*Id.* at 411–13.) He found marked tenderness in the cervical region and a lim-

ited range of motion in the cervical and upper lumbar spine as well as the shoulders. (*Id.* at 412.) Plaintiff was unable to heel walk and toe walk because of back pain, had difficulty getting on and off the examination table, and was able to squat down only partially. (*Id.* at 412–13.) Dr. Shah diagnosed (1) severe back pain with marked limitation of range of motion; (2) severe pain in the neck with marked limitation of range of motion in the cervical spine; and (3) a history of carpal tunnel syndrome. (*Id.* at 413.)

In November 2008, Dr. Hamidani referred Plaintiff for physical therapy. (R. at 561–63.) The contemporaneous report noted that Plaintiff was experiencing significantly reduced cervical and lumbar spine movement, with increased pain and paresthesias.[5] (*Id.* at 562–63.) The report also found that Plaintiff has reduced bilateral shoulder flexion and abduction with rotation due to increased pain and has difficulty with overhead reaching. (*Id.* at 562.)

In January 2009, Dr. Hamidani ordered a polysomnogram[6] for evaluation of possible sleep apnea. (R. at 546–50.) The test revealed that Plaintiff was experiencing "a grossly abnormal sleep architecture." (*Id.* at 547.) The sleep disturbance could be the result of insomnia, depression, or medicine side-effects. (*Id.*) Plaintiff was diagnosed with dysfunctions associated with sleep stages or arousal from sleep. (*Id.*)

---

[5] Paresthesia is "a sensation of pricking, tingling, or creeping on the skin having no objective cause and usually associated with injury or irritation of a sensory nerve or nerve root." < http://www.merriam-webster.com/medlineplus/paresthesias>

[6] A polysomnogram records physiological variables during sleep. < http://www.merriam-webster.com/medlineplus/polysomnogram>

On March 17, 2009, Plaintiff was seen by Gima Vergara, Au.D., for a videonystagmography (VNG) test.[7] (R. at 423.) Plaintiff reported an onset of dizziness six months previously and reported that the dizziness becomes worse when watching moving objects and changing positions. (*Id.*) The VNG test revealed latency was abnormal and that optokinetic nystagmus[8] was abnormal in both directions. (*Id.*) Dr. Vergara concluded that the VNG testing was consistent with a central nervous system (CNS) dysfunction. (*Id.*)

At the administrative hearing on July 9, 2009, Plaintiff testified that she has pain in lower back, right leg, and her hand. (R. at 77.) Her back hurts when she stands up, when she sits down, and even when she lies down. (*Id.* at 85, 88, 91.) Although she had surgery on her back, it did not alleviate the pain. (*Id.* at 80.) Plaintiff's doctor recommended another surgery, but she is leery about an additional surgery because her doctor cannot assure her it will make any difference. (*Id.* at 80, 83.) She has had physical therapy, but it helps her only for that day; the next day, the back pain returns. (*Id.* at 81–82.)

Plaintiff testified that her right leg cramps and gets numb. (R. at 77.) She also has trouble holding things with her hand: "Holding is fine for a second, but I don't have control over it. It just drops, the things in my hand." (*Id.*) Plaintiff also asserted that she experiences headaches, dizziness, buzzing in her ears, and light sensi-

---

[7] A VNG test records eye movements for the evaluation of balance disorders. <http://www.ncbi.nlm.nih.gov/pubmed/20658023>

[8] "Optokinetic nystagmus . . . is the eye movement elicited by the tracking of a moving field." < http://www.dizziness-and-balance.com/testing/okn.htm>

tivity. (*Id.* at 78, 86.) These symptoms cause her to have trouble concentrating. (*Id.* at 78.) She has trouble sleeping because of her back pain and leg cramping. (*Id.* at 84.) Plaintiff also reported that she has been diagnosed with chronic fatigue syndrome, fibromyalgia, depression, anxiety, and sleep disorder. (*Id.* at 83.)

Plaintiff is unable to do housework without assistance from her daughter and husband. (R. at 73.) She is able to drive, but only for a few miles. (*Id.* at 73.) Plaintiff reported that she takes a number of medicines for her pain and other maladies: Ultram, Lyrica, Plavix, Clonidine, Ranitidine, Diazepam, Valium, Zanaflex, and Flexeril.[9] (*Id.* at 70–71.) Many of Plaintiff's medicines cause side effects, including drowsiness, fainting, trouble concentrating, and forgetfulness. (*Id.* at 72.)

The ME testified, based on his review of the medical records, that Plaintiff has chronic L5 and S1 radiculopathy and acute C5 radiculopathy. (R. at 100, 102.) He reported that an MRI of Plaintiff's cervical spine showed broad-based right paramedical disc osteophyte protrusion at C5–6 butting the anterior aspect of the thecal sac,[10] with evidence of some degenerative change. (*Id.* at 103, 104.) "[T]here is evidence of compromise at that level, [which] could be associated with pain, your honor. So, we do have a EMG or objective evidence that there could be a basis for pain."

---

[9] Ultram is prescribed to relieve moderate to moderately severe pain; Lyrica is used to relieve neuropathic pain and fibromyalgia; Plavix is used to prevent strokes and heart attacks; Clonidine is used to treat high blood pressure; Ranitidine is prescribed to treat gastroesophageal reflux disease; Diazepam and Valium are used to relieve anxiety, muscle spasms, and seizures; Zanaflex and Flexeril are prescribed to relieve the spasms and increased muscle tone caused by spinal injury. < www.nlm.nih.gov/medlineplus.html>

[10] "The thecal sac is a membrane of dura mater that surrounds the spinal cord . . . ." <http://en.wikipedia.org/wiki/Thecal_sac>

(*Id.* at 103; *see id.* at 104.) The ME concluded that although the medical evidence does not clearly identify the cause, Plaintiff clearly has abnormal radiculopathies. (*Id.* at 104.) Nevertheless, while the ME acknowledged that Plaintiff was in chronic pain, the ME concluded that the DDS evaluation, which gave Plaintiff a light RFC, was appropriate. (*Id.* at 106.) He found that Plaintiff's physician's RFC was not supported by the physician's office notes. (*Id.*)

On cross-examination by Plaintiff's attorney, the ME acknowledged that Plaintiff's spinal canal measurement of 9mm "may not" be normal. (R. at 109–12.) The ME also acknowledged that the medical records included evidence of decreased range of motion. (*Id.* at 115–20.)

## B. Analysis

Plaintiff raises five arguments in support of her request for a reversal and remand: (1) the ALJ failed to address Plaintiff's various complaints in determining her RFC; (2) the ALJ inappropriately dismissed pertinent evidence that post-dated Plaintiff's date last insured; (3) the ALJ's RFC analysis ignored significant evidence of Plaintiff's limited range of motion; (4) the ALJ erred in discounting the treating physician's opinion; and (5) the ALJ's credibility analysis was deficient. (Mot. 4–15.) The Court addresses each argument in turn.

### 1. The ALJ's Determination of Plaintiff's RFC

The ALJ found that Plaintiff has degenerative disc disease of her cervical spine and status post-laminectomy in her lumbar spine, which cumulatively result in

functional limitations. (R. at 56.) After examining the medical evidence and giving partial credibility to some of Plaintiff's subjective complaints, the ALJ found that Plaintiff has the ability to work at a light level of exertion. (*Id.* at 59.) Specifically, the ALJ found that Plaintiff

> can lift a maximum of 20 pounds occasionally and lift and carry up to 10 pounds frequently, stand and/or walk about 6 hours in a normal 8-hour workday, sit about 6 hours in a normal 8-hour workday, and push and/or pull to include operation of hand and/or foot controls as restricted by the limitations on carrying /lifting subject to postural limitations of only occasionally climbing ladders, ropes, and scaffolds, and only occasionally stooping, kneeling, crouching and crawling.

(*Id.* at 56.)

### a. *The ALJ failed to account for Plaintiff's physical limitations.*

Plaintiff contends that the ALJ's RFC assessment did not sufficiently account for all of her physical limitations. (Mot. 4–10.) While the ALJ summarized Plaintiff's testimony of headaches, dizziness, difficulty concentrating, drowsiness, and the need to lie down, the ALJ failed to explain why he rejected those allegations. (*Id.* 5.) Plaintiff also contends that the ALJ failed to take into consideration the results of a videonystagmography (VNG) test from March 2009, which substantiated Plaintiff's complaints of dizziness and headaches. (*Id.* 8.) Further, Plaintiff argues that the ALJ failed to incorporate Plaintiff's limited range of motion in assessing her RFC. (*Id.* 9.)

"The RFC is an assessment of what work-related activities the claimant can perform despite her limitations." *Young*, 362 F.3d at 1000; *see* 20 C.F.R. § 404.1545(a)(1) ("Your residual functional capacity is the most you can still do de-

spite your limitations."); Social Security Ruling ("SSR")[11] 96-8p, at *2 ("RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."). The RFC is based upon medical evidence as well as other evidence, such as testimony by the claimant or his friends and family. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008). In assessing a claimant's RFC, "the ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe," and may not dismiss evidence contrary to the ALJ's determination. *Villano*, 556 F.3d at 563; *see* 20 C.F.R. § 404.1545(a)(1) ("We will assess your residual functional capacity based on all relevant evidence in your case record."); SSR 96-8p, at *7 ("The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence.").

Here, the ALJ failed to construct a logical bridge between the evidence and the RFC. First, with regard to Plaintiff's complaints of headaches, dizziness, difficulty concentrating, drowsiness, and the need to lie down, the ALJ acknowledged Plain-

---

[11] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000); *see* 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably *bound* by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

tiff's testimony but failed to analyze these limitations in formulating Plaintiff's RFC. (R. at 57–58.) The ALJ's failure is exacerbated by Plaintiff's symptoms having significant support in the medical record. (*See, e.g., id.* at 202 (drowsiness), 317 (frequent headaches), 362 (severe headaches and dizziness), 371 (headaches and dizziness), 372 (frequent headaches), 407 (impaired concentration, frequent severe headaches, and fatigue), 423 (dizziness), 547 ("grossly abnormal sleep architecture").) Moreover, Plaintiff's complaints are consistent with known side effects from her medications. Ultram's side effects include dizziness, sleepiness, difficulty falling asleep or staying asleep, and headache; Lyrica causes tiredness, dizziness, headache, difficulty concentrating or paying attention, confusion, and forgetfulness; Plavix's side effects include excessive tiredness, headache, dizziness, and confusion; Clonidine causes tiredness, weakness, headache, and nervousness; Ranitidine causes headache; Diazepam and Valium cause drowsiness, dizziness, tiredness and weakness; and Zanaflex and Flexeril cause dizziness, drowsiness, weakness, and extreme tiredness. < http://www.nlm.nih.gov/medlineplus.html>

The Commissioner contends that the ALJ "did not ascribe functional limitations to [Plaintiff's] headaches because the objective medical evidence did not support any such limitations." (Resp. 6.) The Court, however, must limit its review to the rationale offered by the ALJ. *See SEC v. Chenery Corp.*, 318 U.S. 80, 90–93 (1943); *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010) ("the government's brief and oral argument . . . seem determined to dissolve the *Chenery* doctrine in an acid of harmless error"). And here, the ALJ provided no reasoning for discounting Plaintiff's

headaches and other symptoms. The Commissioner also argues that "[Plaintiff's] headaches are relevant only if they constitute an impairment that might be disabling." (Resp. 6.) However, Seventh Circuit precedent dictates that the ALJ must assess a claimant's RFC by "evaluating all limitations that arise from medically determinable impairments, even those that are not severe." *Villano*, 556 F.3d at 563.

Second, the ALJ erroneously failed to consider medical evidence obtained after Plaintiff's date last insured ("DLI"). A videonystagmography (VNG) test in March 2009 revealed that optokinetic nystagmus was abnormal in both directions. (R. at 423.) Dr. Vergara concluded that the VNG testing was consistent with a central nervous system (CNS) dysfunction. (*Id.*) The ALJ acknowledged that the results of the VNG test were consistent with CNS dysfunction. (*Id.* at 58.) Nevertheless, because the testing occurred after the DLI, the ALJ concluded that the results were "not appropriate for use in determining . . . disability prior to that date." But Seventh Circuit precedent clearly requires the ALJ to "consider *all* relevant evidence," including post-DLI evidence. *Parker v. Astrue*, 597 F.3d 920, 925 (7th Cir. 2010); *see Free v. Astrue*, No. 09 C 6313, 2011 WL 2415012, at *7–8, *10 (N.D. Ill. June 10, 2011) (remanding where ALJ failed to consider post-DLI evidence).

The Commissioner cites *Eichstadt v. Astrue*, 534 F.3d 663 (7th Cir. 2008), for the proposition that post-DLI evidence is not relevant to the disability period at issue. (Resp. 7 n.7.) But in *Eichstadt* the claimant filed for benefits more than 15 years after her DLI expired. 534 F.3d at 666. Thus, post-DLI evidence indicating that claimant was currently disabled provided little if any evidence that she was disa-

bled 15 years prior. *Id.* Here, the VNG test occurred less than six months after Plaintiff's DLI (R. at 54, 423) and is clearly relevant to whether Plaintiff was disabled during the relevant time period, *see Parker*, 597 F.3d at 925.

> b. *The ALJ's findings did not address Plaintiff's documented limited range of motion.*

Third, the ALJ ignored evidence of Plaintiff's restricted range of motion. In January 2008, Dr. Hamidani found that Plaintiff's forward flexion in the lumbar region, or ability to bend forward, was limited to 30° (R. at 407), as did a December 2007 report from the Neurological Surgery and Spine Surgery medical group (*id.* at 373). Similarly, in February 2008, Dr. Shah, a DDS examining physician, diagnosed Plaintiff with "severe back pain with marked limitation of range of motion." (*Id.* at 413.) Specifically, Dr. Shah found that Plaintiff's flexion was limited to 30°. (*Id.* at 412.) In contrast, the ALJ's RFC found that Plaintiff could stoop occasionally (*id.* at 56), *i.e.*, bend at the waist for up to a third of an eight-hour work day, *see* SSR 83-14, at *2 (defining "occasionally" as "from very little up to one-third of the time"); *Gilbert v. Astrue*, 09 C 7028, 2010 WL 4074276, at *3 (N.D. Ill. Oct. 8, 2010) (noting that stooping is bending at the waist). But the ALJ fails to explain how Plaintiff, who cannot bend at the waist more than 30°, could instead fully stoop for one-third of an eight-hour work day. Nor did the ALJ explain why he rejected these range-of-motion findings, or how they were inconsistent with the medical records. *See Scott v. Astrue*, No. 08 C 5882, 2010 WL 1640193, at*11 (N.D. Ill. Apr. 22, 2010) ("[t]he

ALJ . . . may not choose to disregard certain evidence or discuss only the evidence that favors his or her decision.").[12]

On remand, the ALJ shall reassess Plaintiff's RFC by "evaluating all limitations that arise from medically determinable impairments, even those that are not severe." *Villano*, 556 F.3d at 563. The RFC shall be "expressed in terms of work-related functions" and include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and nonmedical evidence. SSR 96-8p. If the ALJ determines that a second hearing is required, he "must include *all* limitations supported by medical evidence in the record" in posing hypothetical questions to the VE. *Steele*, 290 F.3d at 942.

### 2. Treating Physician's Opinion

Plaintiff contends that the ALJ failed to give controlling weight to the opinion of Dr. Hamidani, her treating physician. (Mot. 10–13.) Plaintiff argues that Dr. Hamidani's opinion is well supported by other medically acceptable clinical and laboratory diagnostic techniques and is consistent with other evidence in the record. (*Id.* 12.)

By rule, "in determining whether a claimant is entitled to Social Security disability benefits, special weight is accorded opinions of the claimant's treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). The opinion of a treating source is entitled to controlling weight if the opinion "is well-supported

---

[12] The Commissioner failed to address this issue.

by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2); *accord Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). A treating physician typically has a better opportunity to judge a claimant's limitations than a nontreating physician. *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996); *Grindle v. Sullivan*, 774 F. Supp. 1501, 1507–08 (N.D. Ill. 1991). "More weight is given to the opinion of treating physicians because of their greater familiarity with the claimant's conditions and circumstances." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Therefore, an ALJ "must offer 'good reasons' for discounting a treating physician's opinion," and "can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(2); other citation omitted).

If a nontreating physician contradicts the treating physician's opinions, it is the ALJ's responsibility to resolve the conflict. *Books*, 91 F.3d at 979 (ALJ must decide which doctor to believe). An ALJ may reject the opinion of a treating physician in favor of the opinion of a nontreating physician where the nontreating physician has special, pertinent expertise and where the issue is one of interpretation of records or results rather than one of judgment based on observations over a period of time. *Micus v. Bowen*, 979 F.2d 602, 608 (7th Cir. 1992) ("[I]t is up to the ALJ to decide which doctor to believe—the treating physician who has experience and knowledge of the case, but may be biased, or . . . the consulting physician, who may bring ex-

pertise and knowledge of similar cases—subject only to the requirement that the ALJ's decision be supported by substantial evidence."); *Hofslien v. Astrue*, 439 F.3d 375, 377 (7th Cir. 2006) ("So the weight properly to be given to testimony or other evidence of a treating physician depends on circumstances.").

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight "the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); *see* 20 C.F.R. § 404.1527. In sum, "whenever an ALJ does reject a treating source's opinion, a sound explanation must be given for that decision." *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) (citing 20 C.F.R. § 404.1527(d)(2)).

In January 2008, Dr. Hamidani completed a Disorders of the Spine Residual Capabilities Questionnaire. (R. at 407–08.) He found Plaintiff's description of pain credible and concluded that work activities would aggravate her pain. (*Id.* at 408.) He opined that Plaintiff's pain would affect her ability to concentrate and maintain attention. (*Id.*) Dr. Hamidani stated that Plaintiff could not perform sedentary work or any employment that required prolonged sitting or standing. (*Id.*) He concluded that she would likely miss more than three days of work per month. (*Id.*)

In his decision, the ALJ's analysis of Dr. Hamidani's opinion is limited to a single paragraph:

> The opinion of [Plaintiff's] primary care provider is given little weight. He submitted his assessment of [Plaintiff's] residual functional capacity and found her severely limited. [The ME] testified that he did not understand how the physician could make that assessment, as the treatment records do not support it. After reviewing the evidence, I agree with the medical expert.

(R. at 59.)

Under the circumstances, the ALJ's conclusory reason—that the ME disagreed—for rejecting Dr. Hamidani's opinion is legally insufficient and is not supported by substantial evidence. A "contradictory opinion of a non-examining physician does not, by itself, suffice" to provide the evidence necessary to reject a treating physician's opinion. *Gudgel*, 345 F.3d at 470; *Oakes v. Astrue*, 258 F. App'x 38, 44 (7th Cir. 2007); *see Holmes v. Astrue*, No. 08 C 338, 2008 WL 5111064, at *7 (W.D. Wis. 2008) ("A contradictory opinion of a non-examining physician is not sufficient by itself to provide the evidence necessary to reject a treating physician's opinion.").

Moreover, the medical evidence supports Dr. Hamidani's opinion. For example, Dr. Shah concluded that Plaintiff has "severe low back pain with marked limitation of range of motion." (R. at 413.) On examination, a board certified neurosurgeon also found that Plaintiff had marked range-of-motion limitations. (*Id.* at 373.) Likewise, a physical therapy report concluded that Plaintiff has "very limited trunk movement with increased lower back pain." (*Id.* at 562.) Further, laboratory and diagnostic tests were consistent with Dr. Hamidani's conclusions. (*See, e.g., id.* at 262 (postoperative MRI), 314–16 (same), 423 (abnormal VNG test results, consistent with CNS dysfunction).) In his decision, the ALJ does not dispute the legitimacy of these tests. *See* 20 C.F.R. § 404.1527(d)(2) (The opinion of a treating source is entitled to

controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence."); *accord Bauer*, 532 F.3d at 608.

Finally, the ALJ did not provide the specific weight he was affording Dr. Hamidani's opinion. *See Campbell*, 627 F.3d at 308 ("Even if an ALJ gives good reasons for not giving controlling weight to a treating physician's opinion, she has to decide what weight to give that opinion."); *Punzio*, 630 F.3d at 710 ("And whenever an ALJ does reject a treating source's opinion, a sound explanation must be given for that decision."). Generally, the Commissioner gives more weight to treating sources, "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(d)(2). "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss*, 555 F.3d at 561; *see* 20 C.F.R. § 404.1527.

Here, the ALJ did not explicitly address the checklist of factors as applied to the medical opinion evidence. *See Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) (criticizing the ALJ's decision which "said nothing regarding this required checklist

of factors"); *Bauer*, 532 F.3d at 608 (stating that when the treating physician's opinion is not given controlling weight "the checklist comes into play"). And many of the factors support the conclusion that Dr. Hamidani's opinion should be given great weight: she treated Plaintiff on a regular basis for over four years; her findings were supported by diagnostic and clinical tests; and her findings were consistent with the medical evidence. "Proper consideration of these factors may have caused the ALJ to accord greater weight to [Dr. Hamidani's] opinion." *Campbell*, 627 F.3d at 308.

The Commissioner attempts to bolster the ALJ's opinion by citing to the ME's testimony. (Resp. 9–10.) The ALJ, however, did not cite any specific testimony in his rejection of Dr. Hamidani's opinion. Thus, the Commissioner "violated the *Chenery* doctrine . . . , which forbids an agency's lawyers to defend the agency's decision on grounds that the agency itself had not embraced." *Parker*, 597 F.3d at 922. In any event, as explained above, the ME's testimony is insufficient, by itself, to reject the opinion of a treating physician. *See Gudgel*, 345 F.3d at 470.

On remand, the ALJ shall reevaluate the weight to be afforded Dr. Hamidani's opinion. If the ALJ finds "good reasons" for not giving Dr. Hamidani's opinion controlling weight, *see Campbell*, 627 F.3d at 306, the ALJ shall explicitly "consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion," *Moss*, 555 F.3d at 561, in determining what weight to give Dr. Hamidani's opinion.

### 3. *Plaintiff's Credibility*

Plaintiff contends that the ALJ erred in discounting her testimony about the nature and extent of her ailments. (Mot. 13–15.) She asserts that the ALJ's credibility determination is "conclusory boilerplate" and "deficient in its analysis." (*Id.* at 13.)

In determining credibility, "an ALJ must consider several factors, including the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons." *Villano*, 556 F.3d at 562 (citations omitted); *see* 20 C.F.R. § 404.1529(c); SSR 96-7p. An ALJ may not discredit a claimant's testimony about her symptoms "solely because there is no objective medical evidence supporting it." *Villano*, 556 F.3d at 562 (citing SSR 96-7p; 20 C.F.R. § 404.1529(c)(2)); *see Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) ("The administrative law judge cannot disbelieve [the claimant's] testimony solely because it seems in excess of the 'objective' medical testimony."). If a claimant's symptoms are not supported by medical evidence, the ALJ may not ignore available evidence. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 540 (7th Cir. 2003). Indeed, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citation omitted); *see* 20 C.F.R. § 404.1529(c); SSR 96-7p.

The Court will uphold an ALJ's credibility finding if the ALJ gives specific reasons for that finding, supported by substantial evidence. *Moss*, 555 F.3d at 561. The ALJ's decision "must contain specific reasons for a credibility finding; the ALJ may not simply recite the factors that are described in the regulations." *Steele*, 290 F.3d at 942 (citation omitted); *see* SSR 96-7p. "Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed." *Steele*, 290 F.3d at 942.

In his decision, the ALJ made the following credibility determination:

> After careful consideration of the evidence, I find it reasonable to expect that [Plaintiff's] medically determinable impairments could cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above residual functional capacity assessment.

(R. at 59.) Under the circumstances, the reason provided by the ALJ for rejecting Plaintiff's credibility is not legally sufficient or supported by substantial evidence.

First, the ALJ's analysis is mere boilerplate that "yields no clue to what weight the trier of fact gave [Plaintiff's] testimony." *Parker*, 597 F.3d at 922 (reviewing similar language and finding that "[i]t is not only boilerplate; it is meaningless boilerplate[; t]he statement by a trier of fact that a witness's testimony is 'not *entirely* credible' yields no clue to what weight the trier of fact gave the testimony"); *see Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 787–88 (7th Cir. 2003) ("This is precisely the kind of conclusory determination SSR 96-7p prohibits. Indeed, the apparently post-hoc statement turns the credibility determination process on its head by finding statements that support the ruling credible and rejecting those state-

ments that do not, rather than evaluating the Brindisis' credibility as an initial matter in order to come to a decision on the merits."). The ALJ does not explain which of Plaintiff's allegations were credible, which were incredible, or provide reasoning in support of his findings. *See Groneman v. Barnhart*, No. 06 C 0523, 2007 WL 781750, at *11 (N.D. Ill. March 9, 2007) ("The ALJ may have provided a *reason* for rejecting [claimant's] allegations—because he did not seek treatment and follow through with medication—but he did not provide *reasoning*."). The ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, at *2.

Second, the ALJ failed to discuss the SSR 96-7p factors. "In determining credibility an ALJ must consider several factors, including the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons." *Villano*, 556 F.3d at 562 (citations omitted); *see* 20 C.F.R. § 404.1529(c)(3); SSR 96-7p, at *3; *accord Steele*, 290 F.3d at 941–42 ("According to Social Security Ruling 96-7p, . . . the evaluation must contain 'specific reasons' for a credibility finding; the ALJ may not simply 'recite the factors that are described in the regulations.' Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed."). The ALJ's failure to analyze these factors warrants reversal. *See Villano*, 556 F.3d at 562 (because "the ALJ did not analyze the factors

required under SSR 96-7p," "the ALJ failed to build a logical bridge between the evidence and his conclusion that [claimant's] testimony was not credible").

Third, the ALJ's finding that Plaintiff's allegations of pain are not supported by the medical evidence (R. at 57–59) is not a legitimate reason for rejecting Plaintiff's credibility. "The ALJ may not discredit a claimant's testimony about her pain and limitations solely because there is no objective medical evidence supporting it." *Villano*, 556 F.3d at 562; *see also Parker*, 597 F.3d at 922 (rejecting statement that "there is little objective evidence to support the claimant's allegations of extreme pain" as legally insufficient). Instead,

> because symptoms, such as pain, sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, the adjudicator must carefully consider the individual's statements about symptoms with the rest of the relevant evidence in the case record in reaching a conclusion about the credibility of the individual's statements if a disability determination or decision that is fully favorable to the individual cannot be made solely on the basis of objective medical evidence.

SSR 96–7p, at *1. In any event, as discussed above, Plaintiff's symptoms were supported by the medical evidence.

Finally, the ALJ failed to consider the side effects of Plaintiff's medications. As discussed above, Plaintiff's symptoms were consistent with known side effects from her medications, which significantly interfered with Plaintiff's ability to work. *See* 20 C.F.R. §§ 404.1529(c)(3)(iv), 416.929(c)(3)(iv) (instructing Commissioner to consider the side effects of a claimant's medications); *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir.2004) (observing that ALJ must consider medication side effects when evaluating claimant's credibility); *see also Grieves v. Astrue*, No. 07 C 4404, 2008

WL 2755069, at *16 (N.D. Ill. July 11, 2008) (requiring ALJ to include the side effects of claimant's medications in disability determination).

The Commissioner contends that the ALJ properly rejected Plaintiff's credibility by relying on the ME's observation that while the medical evidence "showed [Plaintiff] seeking treatment for many complaints[,] . . . when she was tested 'invariably, these studies proved to be negative.'" (R. at 58; *see* Resp. 5.) But the ALJ's quote from the ME's testimony is factually incorrect. In fact, the ME conceded that two separate clinical tests provided a medical basis for Plaintiff's pain allegations. (R. at 103–04.)

The Commissioner also argues that the ALJ could reject Plaintiff's credibility because she "declined to pursue her physician's treatment recommendation." (Resp. 5.) "In assessing credibility, infrequent treatment or failure to follow a treatment plan can support an adverse credibility finding where the claimant does not have a good reason for the failure or infrequency of treatment." *Craft*, 539 F.3d at 679. But here, the ALJ acknowledged that Plaintiff, who already had one unsuccessful back surgery, declined to pursue a second surgery because her doctors could not assure her it would provide any relief. (R. at 57.) Moreover, the ALJ did not use Plaintiff's decision not to have a second surgery to support his negative credibility finding. (*See id.* at 58.) The Court must limit its review to the rationale offered by the ALJ. *See Chenery Corp.*, 318 U.S. at 90–93; *Spiva*, 628 F.3d at 353.

On remand, the ALJ shall reevaluate Plaintiff's complaints with due regard for the full range of medical evidence. *See Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001).

## C. Summary

In sum, the ALJ has failed to "build an accurate and logical bridge from the evidence to her conclusion." *Steele*, 290 F.3d at 941 (internal quotation omitted). This prevents the court from assessing the validity of the ALJ's findings and providing meaningful judicial review. *See Scott*, 297 F.3d at 595. For the reasons set forth herein, the ALJ's decision is not supported by substantial evidence. On remand, the ALJ shall reevaluate the weight to be afforded Dr. Hamidani's opinion, explicitly addressing the required checklist of factors. The ALJ shall reassess Plaintiff's credibility with due regard for the full range of medical evidence. The ALJ shall then reevaluate Plaintiff's physical impairments and RFC, considering all of the evidence of record, including Plaintiff's testimony, and shall explain the basis of his findings in accordance with applicable regulations and rulings.

## V. CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [Doc. 16] is **GRANTED**, and Defendant's Motion for Summary Judgment [Doc. 18] is **DENIED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

E N T E R:

Dated: October 22, 2012

_____
MARY M. ROWLAND
United States Magistrate Judge